## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| THE YORK GROUP, INC., | § | |
|     Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-06-0262 |
| | § | |
| HORIZON CASKET GROUP, INC., | § | |
| *et al.*, | § | |
|     Defendants. | § | |

--------------------------------------------------------------------------------

| | | |
|---|---|---|
| THE YORK GROUP, INC., | § | |
|     Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-05-2181 |
| | § | |
| HORIZON CASKET GROUP, INC., | § | |
| *et al.*, | § | |
|     Defendants. | § | |

## MEMORANDUM AND ORDER ON YORK'S MOTION FOR PARTIAL SUMMARY JUDGMENT

This is a civil commercial lawsuit brought by Plaintiff The York Group, Inc.

("York") against various defendants, including Delta Casket Company, Inc., and Delta

Casket Enterprises, Inc. (collectively, "Delta"). York has filed a Motion for Partial

Summary Judgment ("Motion") [Doc. # 122 in Case No. 4:05-cv-2181[1]] seeking

summary judgment on liability on its breach of contract claims.[2]  Having considered all

the parties' submissions on the Motion, all matters of record, and applicable legal

authorities, the Court concludes that York's Motion for Partial Summary Judgment

should be **denied**.

## I.      FACTUAL BACKGROUND

York manufactures funerary caskets that are purchased by distributors who, in

turn, sell them to funeral homes throughout the United States.  In 1999, Delta and York

entered a written distributorship agreement ("Agreement") that governed Delta's use

of York's "trademarks, trade names, service marks, copyrights, patents, brand names,

labels, symbols or other proprietary rights" (collectively, the "Marks").[3]   Delta

terminated the Agreement at the end of 2001, but York caskets continued to constitute

the bulk of Delta's sales.  Under the Agreement, upon termination, Delta committed

---

[1]      Delta's Motion was filed prior to the consolidation of these cases.  Unless otherwise noted, each docket number refers to this consolidated lead case, 4:06-cv-0262.  This Memorandum and Order will be docketed in each case in order to create a full record of the disposition of the Motion.

[2]      Delta has filed a Response [Doc. # 137 in Case No. 4:05-cv-2181], and York has filed a Reply [Doc. # 148 in Case No. 4:05-cv-2181], followed by Delta's Sur-Reply [Doc. # 101 in the consolidated Case No. 06-0262].

[3]      Agreement, Motion for Partial Summary Judgment of Liability on Contract and Lanham Act Claims (the "First Motion") [Doc. # 88 in Case No. 4:05-cv-2181], Exhibit A, Section 4.1, at 7.  Collectively, these protectable assets are referred to as "the Marks."  *Id.*

that it would "not thereafter use any trademark, trade name, servicemark, brand name, label or symbol which gives or may give the impression that the relationship between the parties . . . still exists, or do any other act tending to impair or damage the Marks."[4]

In 2002, Delta decided to have caskets manufactured in China for sale in the United States.  By 2004, Delta was selling Chinese-manufactured caskets in domestic markets where York caskets were also sold.  It is undisputed that there were similarities between York caskets, which Delta continued to sell, and the imported Chinese caskets.

York claims that the Delta entities breached the Agreement by using York's Marks in producing and marketing those imports, and that the imports harmed the value of York's Marks and commercial interests.  Specifically, York accuses Delta of marketing caskets under the same "brand names"[5] as York's caskets, and using York's copyrighted photographs and lithographs of York products to do so.[6]

---

[4]      *Id*. at Section 4.2, at 7.

[5]      "For example, York manufactures and sells a large number of distinctive caskets under the Mark and brand name 'Sterling.'"  Complaint, at 6, ¶ 19.  Delta disputes York's characterization of the casket names as brand names or other protectable intellectual property, as discussed *infra*.

[6]      *See id*., at 6, ¶¶ 18-19.

Earlier in the litigation, York moved for summary judgment on its breach of contract claims.[7]  The Court held, on the then-available record, that there was no material issue of genuine fact on three of four elements of a breach of contract claim under Texas law.[8]  Specifically, the Court concluded that Delta failed to show a fact issue on the existence of a valid contract, on York's having tendered performance, and on Delta's breach of a duty in the contract.[9]  Because York failed to show that it was actually damaged by the breach, however, the Court held that York had not met its summary judgment burden and denied the First Motion.[10]  York now re-urges its request for summary judgment in its favor on the breach of contract theory against Delta.

## II.  **SUMMARY JUDGMENT STANDARD**

Rule 56 of the Federal Rules of Civil Procedure mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a sufficient showing of the existence of an element essential to the party's case for which that party will bear the burden at trial.  *Celotex Corp. v. Catrett*, 477 U.S.

---

[7]     *See* First Motion.

[8]     Texas law requires proof of four elements for a breach of contract claim.  *See* page 7, *infra*.

[9]     *See* Memorandum and Order of October 13, 2006 ("October 13 Memorandum") [Doc. # 108 in Case No. 05-2181], at 6-11.

[10]    *See id.* at 11.

317, 322 (1986); *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir. 1994) (en

banc); *see also Baton Rouge Oil and Chem. Workers Union v. ExxonMobil Corp.,* 289

F.3d 373, 375 (5th Cir. 2002).  In deciding a motion for summary judgment, the Court

must determine whether "the pleadings, depositions, answers to interrogatories, and

admissions on file, together with any affidavits filed in support of the motion, show that

there is no genuine issue as to any material fact and that the moving party is entitled to

judgment as a matter of law."  FED. R. CIV. P.  56(c); *Celotex Corp.*, 477 U.S. at 322-

23; *Hart v. Hairston*, 343 F.3d 762, 764 (5th Cir. 2003).

Where the movant bears the burden of proof at trial on the issues at hand, as is

the case here, it "bears the initial responsibility of demonstrating the absence of a

genuine issue of material fact with respect to those issues."  *Transamerica Ins. Co. v.

Avenell*, 66 F.3d 715, 718 (5th Cir. 1995).  If the moving party fails to meet its initial

burden, the motion for summary judgment must be denied, regardless of the non-

movant's response.  *ExxonMobil Corp.*, 289 F.3d at 375.

If the moving party meets its initial burden, the non-movant must go beyond the

pleadings and designate specific facts showing that there is a genuine issue of material

fact for trial.  *Littlefield v. Forney Indep. Sch. Dist.*, 268 F.3d 275, 282 (5th Cir. 2001).

"An issue is material if its resolution could affect the outcome of the action.  A dispute

as to a material fact is genuine if the evidence is such that a reasonable jury could

return a verdict for the nonmoving party." *DIRECT TV Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2006) (internal citations omitted).

In deciding whether a genuine and material fact issue has been created, the facts and inferences to be drawn from them must be reviewed in the light most favorable to the nonmoving party. *Reaves Brokerage Co. v. Sunbelt Fruit & Vegetable Co.*, 336 F.3d 410, 412 (5th Cir. 2003). However, factual controversies are resolved in favor of the non-movant "only when there is an actual controversy—that is, when both parties have submitted evidence of contradictory facts." *Olabisiomotosho v. City of Houston*, 185 F.3d 521, 525 (5th Cir. 1999). The non-movant's burden is not met by mere reliance on the allegations or denials in the non-movant's pleadings. *See Diamond Offshore Co. v. A&B Builders, Inc.*, 302 F.3d 531, 545 n.13 (5th Cir. 2002) (noting that unsworn pleadings do not constitute proper summary judgment evidence). Likewise, "unsubstantiated or conclusory assertions that a fact issue exists" do not meet this burden. *Morris v. Covan World Wide Moving, Inc.*,  144 F.3d 377, 380 (5th Cir. 1998). Instead, the nonmoving party must present specific facts which show "the existence of a 'genuine' issue concerning every essential component of its case." *Id.* In the absence of any proof, the court will not assume that the non-movant could or would prove the necessary facts. *Little*, 37 F.3d at 1075 (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)).

Finally, "[w]hen evidence exists in the summary judgment record but the nonmovant fails even to refer to it in the response to the motion for summary judgment, that evidence is not properly before the district court." *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003). "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *See id.* (internal citations and quotations omitted); *see also De la O v. Hous. Auth. of El Paso*, 417 F.3d 495, 501 (5th Cir. 2005).

## III.   <u>ANALYSIS</u>

All parties rely on Texas law for their arguments.[11]  Texas law requires proof of four elements for a breach of contract claim: "(1) the existence of a valid contract; (2) that the plaintiff performed or tendered performance; (3) that the defendant breached the contract; and (4) that the plaintiff was damaged as a result of the breach." *Frost Nat'l Bank v. Burge*, 29 S.W.3d 580, 593 (Tex. App.—Houston [14th Dist.] 2000, no pet.) *(quoted by Bring on v. Array Systems Corp.*, 325 F.3d 572, 577 (5th Cir. 2003)).

York is seeking summary judgment on a claim as to which it has the burden of proof at trial.  It therefore bears the initial burden of showing that there is no genuine material issue of fact as to each element of its breach of contract claim.  *See*

---

[11]    The Agreement provides that Texas law governs its interpretation and all questions pertaining to it.  Agreement, Section 8.13, at 14.

*Transamerica Ins. Co. v. Avenell*, 66 F.3d 715, 718 (5th Cir. 1995).  Delta asserts arguments on the three breach of contract elements other than Plaintiff York's performance of its obligations under the Agreement.  Delta has supplemented the record with additional summary judgment evidence.  In the interest of a full and fair adjudication of this issue, the Court considers Delta's new evidence as well as the parties' pertinent arguments asserted in connection with the earlier-filed Motion for Summary Judgment (the "First Motion").

**Existence of Binding Contract Provisions**. — Turning to the first element, the validity of the Agreement, York contends that Delta violated three specific provisions:

> Section 4.1  Ownership of Marks  Distributor acknowledges York's exclusive ownership of York's trademarks, trade names, servicemarks, copyrights, patents, brand names, labels, symbols or other proprietary rights (collectively, the "Marks") . . . Distributor shall use the Marks in such a manner so as to best preserve York's interests in the Marks, and Distributor shall not acquire any right or interest, legal, equitable or otherwise, in the Marks by any such use or by any means other than by specific written assignment of such rights or interests by York.

> Section 4.2  Use of Marks. . . .  Distributor will not sell any caskets under any Mark of York which are not Products of York. . . .  Distributor shall not, at any time during or after the Term, register or use any mark that is similar to a Mark by itself or in combination with any other words, symbols or designs without the express written authorization of York.

> *   *   *   *

> Section 6.6  Obligations Upon Termination.  Upon termination of this Agreement for any reason:

(a)      Distributor shall within 10 days remove all references to York and the Marks from Distributor's place or name of business, listings, letterheads, catalogs, advertising and other literature, and shall not thereafter use any trademarks, trade name, servicemark, brand name, label or symbol which gives or may give the impression that the relationship between the parties under this Agreement still exists, or do any act tending to impair or damage the Marks;

*   *   *   *

(e)      Distributor agrees and acknowledges that any goodwill associated with York and the Products is the exclusive property of York.  Distributor agrees that it will not act in any manner detrimental to the sale and distribution of the Products or to the reputation or goodwill of York or the Products.

York correctly argues that these sections survived the Agreement itself, which Delta allegedly terminated in 2001.  Only Section 4.1 is explicitly included in the contract's survival clause, Section 8.17, which states: "The provisions of Section[ ] . . . 4.1 . . . shall survive the termination of this agreement."  Section 8.17 is not exclusive, however, and does not nullify the specific language in Section 4.2, which bound Delta not to "at any time during *or after the Term*, register or use any mark that is similar to a Mark . . . without the express written authorization of York" (emphasis added).  Similarly, the obligations in Section 6.6 explicitly arise only once the contract is terminated.  The prefatory language of Section 6.6 states:  "*Upon termination of this Agreement* for any reason . . . Distributor agrees that it will not act in any manner detrimental to the sale and distribution of Products" (emphasis added).

Delta argues that "sections 8.17, 4.2, and 6.6 are contradictory in terms of their survival."[12]  Accordingly, it urges, the provisions must "be harmonized if possible to reflect the intentions of the parties," and the need for harmonization "contemplates the existence of an ambiguity" sufficient to forestall summary judgment.[13]  This argument is unpersuasive.  The Agreement is internally consistent.  Section 8.17, the survival clause, is not ambiguous or exclusive.  It states simply that the "[t]he provisions of [ten named sections] shall survive the termination of this Agreement."[14] Many of those sections contain no language providing for their own survival, and would have terminated with the Agreement without  Section 8.17.

Delta's contentions are rejected.  First, Section 8.17 includes Section 4.1 in its list of provisions that survive.  As to Sections 4.2 and 6.6, each by its own terms survive termination of the Agreement.  Nothing suggests that Section 8.17 was intended to contravene these provisions' plain language.  Accordingly, Sections 4.1, 4.2, and 6.6 are binding contractual provisions that survived the termination of the Agreement.

**Breach of Contract.** — York accuses Delta of violating Sections 4.1, 4.2 and 6.6 of the Agreement by misappropriating and misusing its Marks to the detriment of

---

[12]     Sur-Reply, at 7.

[13]     *Id*. (citing *Ogden v. Dickinson State Bank*, 662 S.W.2d 330, 332 (Tex. 1983)).

[14]     Agreement, Section 8.17.

York.  As relevant here, the Agreement requires Delta to "use the Marks in such a manner so as to best preserve York's interests in the Marks"[15]; to not "sell any caskets under any Mark of York which are not Products of York" or "use any mark that is similar to a Mark by itself or in combination with any other words, symbols or designs"[16]; and, within 10 days of the termination of the Agreement, to "remove all references to York and the Marks" from Delta's property and "not thereafter use any trademarks, trade name, servicemark, brand name, label or symbol which gives or may give the impression that the relationship between the parties under this Agreement still exists, or do any act tending to impair or damage the Marks."[17]

In the October 13 Memorandum, the Court held that York carried its summary judgment burden as to the breach element.  The Court noted that Delta had not "identified any specific evidence in the summary judgment record that creates a genuine issue of material fact as to whether it sold imported caskets under York's Marks without York's approval."[18]  Delta now has supplemented the summary judgment record in material ways.  On the present record, the Court finds that there are factual

---

[15]     *Id.*, Section 4.1.

[16]     *Id.*, Section 4.2.

[17]     *Id.*, Section 6.6.

[18]     October 13 Memorandum, at 11.  This holding related specifically to the alleged use of lithographs of York's caskets to facilitate the manufacture of competing products. *See* pages 14-15, *infra*.

controversies regarding Delta's alleged breaches of contract that preclude summary judgment.

York's primary breach of contract theory, as expressed in its First Motion, is that Delta "marketed the Chinese caskets under the same [proprietary] brand names as York caskets."[19] The names York identifies are, in effect, model names for different casket designs, such as "Hamilton," "Hancock," "Homestead," "Pearl Rose," "Revere," or "Lakeshore II."[20]   York refers to these as "brand names," which it argues are protectable intellectual property that the parties intended to be covered under Sections 4.1, 4.2, and 6.6 of the Agreement.   Delta presents summary judgment evidence establishing a factual controversy on whether these names are proprietary to York. Dennis Laphan, an expert designated by Delta to testify about common business practices within the casket industry, explained that in his experience "none of the York casket names qualify as being trademarks, brand names or any other form of proprietary property."[21]   Laphan opines that the casket names are not "brand names" intended to identify a manufacturer, but rather to "communicate some attribute or value

---

[19]   First Motion, at 9.   York has not further developed its theories on breach in the present Motion or its Reply.

[20]   Excerpts from Delta Website, First Motion [Doc. # 88 in Case No. 4:05-cv-2181], Exhibit L, at 8

[21]   Affidavit of Dennis Laphan ("Laphan Aff."), Response, Exhibit C, at 7, ¶ 23.

inherent in the casket."[22]  Such names, he says, "have been and continue to be simply copied from others and used at random."[23]  He explains that the casket names, such as the "Neopolitan" model, are used by various manufacturers, such as York and one of its competitors, a company he refers to as Batesville.  Laphan specifically references the names York contends were infringed upon, noting that out of the "list of 62 disputed names" he reviewed, he saw "ample evidence of the 'unrestricted borrowing' that is the norm."[24]  He asserts that "there are 341 non-York users of the 62 disputed names," that ten of those names "are in use by at least 10 and as many as 27 other companies within the casket industry," and that "[o]ne of the disputed names (Provincial) is a registered trademark owned by Batesville."[25]  According to Laphan, as a consequence of the casket industry's practice of using the same names for competing products, a customer could only determine the manufacturer of a particular "Neopolitan" model casket if it included specific, patented features exclusive to a specific manufacturer,[26] if the name was trademarked,[27] or if it was referred to as a

---

[22]    *Id*. at 10, ¶ 35.

[23]    *Id*.

[24]    *Id*. at 12, ¶ 49.

[25]    *Id*.

[26]    An example is a patented, built-in repository for keepsakes and documents.  *Id*. at 13, ¶¶ 54-55.

[27]    *Id*. at 12, ¶ 47.

"York Neopolitan" or "Batesville Neopolitan" casket.[28]  York has not alleged that its caskets were identified by patented, unique features; that it trademarked the names of its products; or that Delta appended the "York" name to the imported caskets. Laphan's affidavit establishes a genuine question of material fact as to whether the names of York's caskets were proprietary Marks under the Agreement.  Accordingly, summary judgment is not appropriate as to the question of breach under any theory relying on the casket names as "brand names" or other Marks protected under the Agreement.

Delta has also shown the existence of a material fact issue on York's breach of contract theory that Delta allegedly misused York's Marks, namely lithographs of York's products, during the production of the Chinese caskets.  York alleges that Delta showed the Chinese manufacturers York's lithographs to copy.  York also points to a "group inspection checklist" used in China that "instructs each inspector to 'verify casket VS. York litho (each inspector have [sic] a litho book).'"[29]  Delta's own affidavit evidence reveals that its agents used the York lithographs as "a reference" for the inspection of the Chinese caskets, but the affiant denied that the Chinese caskets

---

[28]     Id. at 9, ¶¶ 31-35.

[29]     October 13 Memorandum, at 10 (emphasis original).

were intended to "look like the photographs."[30]  Delta admits in its Response that "the lithographs (pictures) of York caskets were simply being used to give the Chinese a better grasp of where certain types of shading or types of design features would be on a casket to be sold in America."[31]

If copyrighted, York's lithographs shown by Delta to the Chinese manufacturers would likely be Marks under Section 4.1 of the Agreement.  York, however, has not submitted evidence that it held copyrights on those lithographs.[32]  There is a genuine issue of material fact as to the source of the lithographs, and whether they are proprietary to York at all.  Further, York cites no authority for the proposition, on which it appears to rely, that publicly available depictions of its products (the lithographs) are "copyrights . . . or other proprietary rights" under Section 4.1.  Therefore, York has not shown that Delta's conduct in China of showing lithographs

---

[30]    "I took the photos [to China] because they were having problems with color combinations. . . .  As far as what the shading is. . . .  The picture showed what—where the shading should be—what locations it should be."  Deposition of Tracy Jobes ("Jobes Depo."), Response, Exhibit H, at 198-99.

[31]    Response, at 17 (citing Jobes Depo. at 197-99).

[32]    Although Delta contracted to "not act in any manner detrimental to the sale and distribution of the Products or to the reputation or goodwill of York or the Products," there remains a fact issue as to whether Delta's use of the lithographs materially assisted the Chinese manufacturers to closely copy York's products and thus actually adversely affected York's sales of those products.  *See* Agreement, Section 6.6(a), 6.6(e).

of York's products violated Section 4.2 and is not entitled to summary judgment on the issue.

Finally, York contends that Delta breached its obligations under Section 6.6(a) by continuing to use York's trademark on its website.  York argues that Delta distributed a price list for Horizon caskets that invited potential customers to visit Delta's website, and that the site contained only photographs of York caskets bearing York's copyrighted images and trademarked logo.[33]  York's theory apparently is that a Delta customer who intended to purchase a Horizon casket would have to (or would be likely to) go to the Delta website to see an example of that casket because there were no pictures on or distributed with the Delta price list for Horizon caskets.  York points out that, because the website only offered examples of similarly-named York caskets, the customer could only view York's copyrighted images to evaluate Horizon caskets, and thus Delta violated Sections 4.1, 4.2 and/or 6.6 of the Agreement.[34]  Delta responds that, because the York images were used on the website primarily to sell York

---

[33]    "Delta has posted unauthorized copies of lithographs and/or photographs contained in York Copyrighted Materials on its website."  Complaint, at 7, ¶ 20.  *See also* Website Excerpts, at 8 (showing image of "Lakeshore II" casket with the notation, "© Copyright 2000 by The York Group, Inc." and bearing York's corporate logo).  Only York caskets could be purchased through the website.  *See* Deposition of Gerald Kilpatrick, First Motion, Exhibit C, at 480 ("[Customers] cannot go to the website and see a Horizon casket, because they're not on the website.").

[34]    *See* First Motion, at 9-10.

casket, its use of the images was not detrimental to York's interests.[35]  Pointing out that the website discussed a York charity and promoted the "value associated with the fabric interior of York caskets," Delta asserts that "it is clear that the webpage was being utilized to sell York caskets, especially since there is no mention of Horizon products on the site."[36]

York has not explained how Delta's use of its Marks on the Delta website to sell York's own products would violate the Agreement.  York also has not shown that Delta labeled Horizon caskets with York's name or logo.  Rather, the focus appears to be on Delta's sales of Horizon caskets that were advertised with the Delta or Horizon company name.  While there may be power in York's theory that Delta customers likely turned to the Delta website to see examples of Horizon caskets but were able to see photos or depictions of only York's designs, the record is unclear how Delta's customers that purchased Horizon caskets made their selections.  Because the extent to which purchasers of Horizon caskets actually relied on the Delta website is a

---

[35]     *See* Response to First Motion, at 18-19.

[36]     Response to First Motion, at 19.  Delta does not deny that it used York's trademarks and copyrighted photos on its website, and did so as late as 2004, despite Section 6.6(e)'s mandate that Delta "remove all references to York and the Marks" from its "catalogs, advertising, and other literature" within 10 days of the termination of the Agreement, which occurred in 2001, and that Delta not thereafter use "any trademarks, label, or symbol" of York.  Agreement, Section 6.6(e).  The parties have not expressly addressed this theory, and the Court does not reach it.

question of material fact, summary judgment is inappropriate on whether the website violated Sections 4.1, 4.2, or 6.6(a) of the Agreement.

**Damages.** — The final element of a breach of contract claim requires proof that the plaintiff suffered some damage resulting from the defendant's conduct.  *See, e.g., Frost Nat'l Bank*, 29 S.W.3d at 593; *Taub v. Houston Pipeline Co.*, 75 S.W.3d 606, 615 (Tex. App.—Texarkana 2002, pet. denied); *Scott v. Sebree*, 986 S.W.2d 364, 372-73 (Tex. App.—Austin 1998, pet. denied).   In the First Motion, York implicitly acknowledged that it produced no evidence on this subject, contending instead that because that Motion was limited to liability on certain claims, York did not need to show damages.  The Court disagreed, so York now offers affidavits to show that it was actually damaged as a consequence of Delta's conduct.  Primarily, York relies on the affidavit of Wendell Naylor, the manager of a funeral parlor who states that he purchased what he believed were York products from Delta, only later to learn that they in fact were imported caskets.[37]

---

[37]    *See* Affidavit of Wendell Naylor ("Naylor Aff."), Motion, Exhibit C, at 3, ¶ 6.  York also supplies the Affidavit of Walter Johnson ("Johnson Aff."), Motion, Exhibit F.  Johnson, who purchased Horizon caskets in his line of business as a funeral director, asserts that he believed at all times that he was buying York products.  *Id*. at 1.  According to York, Johnson discovered "that Horizon caskets were not affiliated with York after an incident where the deceased partially fell through the bottom of a Horizon casket thought to be a York casket."  Motion, at 5-6 (citing Johnson Affidavit, at 1, ¶ 6).  York argues that this shows both lost sales and damage to its reputation.  *Id*.  York misrepresents the affidavit, however.  Johnson explains that he "was under the impression that the Horizon caskets were associated with

(continued...)

Delta contends that the Naylor affidavit should be stricken because the affidavit was not timely disclosed.  To the extent Delta complains about not knowing earlier the details of Naylor's testimony, the objection is overruled.  York disclosed in its initial disclosures that Naylor was a person with relevant knowledge.[38]  Once Delta learned of the affidavit, it took Naylor's deposition.  This occurred prior to Delta's filing its response to York's Motion.  The fact that the affidavit itself was not disclosed immediately after it was prepared, while inappropriate, does not bar its admission under the circumstances presented.

Delta also argues that the Naylor affidavit is "not based on personal knowledge."[39]  Delta contends that, because Naylor himself did not personally enter each order for his funeral home's casket purchases, he "had no personal knowledge regarding the invoices attached [to the orders] and cannot state that the orders were for York caskets."[40]  Naylor's uncontroverted deposition testimony, however, reveals that

---

[37]     (...continued)
York" as a lower-priced alternative to York's standard products, but he does not describe any incident such as the one York puts forth as a basis for damage to its reputation. Johnson Aff., at 1, ¶ 5.  Johnson explained in his deposition that an "incident" caused him to take his business to one of York's competitors, but there is no description of that incident in the record.  Deposition of Walter Johnson, Motion, Exhibit G, at 118.

[38]    *See* Reply, at 9; York's Disclosures, Reply, Exhibit A, at 14 ("Mr. Naylor . . . . has knowledge concerning the substitution by Defendants of Horizon Chinese caskets for York caskets.").

[39]    Sur-Reply, at 5.

[40]    Response, at 9.

he was personally aware of the products his company ordered.[41]  There is sufficient basis in the record to establish Naylor's personal knowledge of the products ordered in the invoices on which he relies for his testimony.[42]

York may use the Naylor affidavit to prove it suffered loss of sales for summary judgment purposes.  The Court concludes that the Naylor affidavit meets York's summary judgment burden on the element of damage caused by Delta's conduct. Summary judgment nevertheless is denied because there are open questions of material fact as to whether Delta's conduct breached the parties' contract.

## IV.   <u>CONCLUSION</u>

York has shown that there is no genuine question of material fact that Sections 4.1, 4.2, and 6.6 of the Agreement continued in effect after termination of that Agreement.  Delta's evidence in the Summary Judgment record raises significant questions as to whether Delta breached any of those sections.  York has not shown that it is entitled to judgment on its breach of contract theories.  It is therefore

---

[41]   Deposition of Wendell Naylor, Reply to Motion, Exhibit B, at 31.  Naylor stated that "all caskets have to . . . come across my desk before they are ordered."  *Id.*

[42]   Delta makes other objections to the affidavit.  Delta argues, for example, that Naylor never complained about the nonconforming shipments, and that the affidavit went "back and forth" between Naylor and his attorney.  Response, at 9.  These facts, Delta suggests, raise "some questions concerning the veracity of his claims."  *Id.*  This speculation about Naylor's credibility is not a ground to strike the affidavit for summary judgment purposes.

**ORDERED** that York's Second Motion for Partial Summary Judgment [Doc. # 122 in Case No. 4:05-cv-2181] is **DENIED**.

**SIGNED** at Houston, Texas, this **11**[th] day of **July, 2007**.

Nancy F. Atlas
United States District Judge